## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

HEATHER GARCIA,                    :
                                   :
                    Plaintiff      :      No. 3:15-CV-0171
                                   :
            vs.                    :      (Judge Nealon)
                                   :
CAROLYN W. COLVIN, Acting          :                        **FILED**
Commissioner of Social Security,   :                        **SCRANTON**
                                   :                        APR 2 6 2016
                    Defendant      :
                                          Per_____
                                              DEPUTY CLERK

## MEMORANDUM

On January 26, 2015, Plaintiff, Heather Garcia, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI")[2] under

Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. §

1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For

the reasons set forth below, the decision of the Commissioner denying Plaintiff's

applications for DIB and SSI will be vacated.

_____

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her applications for DIB and SSI on September 21, 2010, alleging disability beginning on June 15, 2009 due to Bipolar Disorder, Irritable Bowel Syndrome ("IBS"), Gastroparesis, Asthma, obesity, Post-traumatic Stress Disorder ("PTSD"), Restless Leg Syndrome ("RLS"), Carpal Tunnel Syndrome, Degenerative Disc Disease ("DDD"), depression, and anxiety. (Tr. 261).[4] These claims were initially denied by the Bureau of Disability Determination ("BDD")[5] on May 26, 2011. (Tr. 76). On July 22, 2011, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 76). An oral hearing was held on March 4, 2013, before administrative law judge Sharon Zanotto, ("ALJ"), at which Plaintiff and an impartial vocational expert, Sheryl Bustin, ("VE"), testified. (Tr. 76). On April 26, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on April 10, 2015. (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

infra, Plaintiff was capable of performing light work with limitations.  (Tr. 81).

On June 26, 2013, Plaintiff filed a request for review with the Appeals Council.  (Tr. 72).  On December 9, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on January 26, 2015.  (Doc. 1).  On April 10, 2015, Defendant filed an answer and transcript from the SSA proceedings.  (Docs. 9 and 10).  Plaintiff filed a brief in support of her complaint on May 25, 2015.  (Doc. 12).  Defendant filed a brief in opposition on June 25, 2015.  (Doc. 14).  Plaintiff filed a reply brief on July 2, 2015.  (Doc. 15).

Plaintiff was born in the United States on December 23, 1968, and at all times relevant to this matter was considered a "younger individual."[6]  (Tr. 205). Plaintiff obtained her GED in 1998, and can communicate in English.  (Tr. 260, 262).  Her employment records indicate that she previously worked as a clerical worker, receptionist, and a customer service representative.  (Tr. 246-248).  The

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.  See Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

records of the SSA reveal that Plaintiff had earnings in the years 1997 through 2003 and 2005 through 2007. (Tr. 238). Her annual earnings range from a low of no earnings in 2004 to a high of eleven thousand two hundred ninety-six dollars and ninety-one cents ($11,296.91) in 2007. (Tr. 238).

In a document entitled "Function Report - Adult" filed with the SSA on December 6, 2010, Plaintiff indicated that she lived in an apartment with her family. (Tr. 269). From the time she woke up to the time she went to bed, Plaintiff got her children ready for school, drove them to school, went home and slept or took her husband to work, and used the computer. (Tr. 269-270). She took care of her children, with the help of her husband, by helping them to get dressed, feeding them, taking them to appointments, and helping them with personal hygiene. (Tr. 270). She was able to prepare simple meals once in a while, and cleaned the house and dishes and did the laundry for a couple of hours, but she did not do these tasks often. (Tr. 271). She needed to encouragement to do these tasks because she had no motivation "due to [her] depression." (Tr. 271). She shopped for clothes and groceries about two (2) to three (3) times a month for an hour at a time. (Tr. 272). She was able to walk for fifteen (15) minutes before needing to rest for ten (10) to fifteen (15) minutes before resuming walking. (Tr. 274). When asked to check items which her "illnesses, injuries, or conditions

4

affect," Plaintiff did <u>not</u> check lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, following instructions, using hands, or getting along with others. (Tr. 274). She explained that the PTSD affected her memory with flashbacks, and the thoughts she had made it hard to concentrate and stay on task. (Tr. 274).

Regarding concentration and memory, Plaintiff needed special reminders to take care of her personal needs, take her medicine, and attend her appointments. (Tr. 271, 273). She could count change, pay bills, handle a savings account, and use a checkbook. (Tr. 272). She followed written instructions "good" and spoken instructions "not good," she was not able to finish what she started, she did not hand stress well, and she found it hard to handle changes in routine. (Tr. 274-275).

Socially, Plaintiff went outside "very little," and only went out alone if she "absolutely [had] to." (Tr. 272). She talked to her best friend on the phone everyday, and attended therapy and church regularly. (Tr. 273). Her hobbies included dancing, reading, and coloring, but she did not engage in these hobbies any longer because she no longer had "any desire to do thing that ma[d]e [her] happy." (Tr. 273). She did not have problems getting along with family, friends, neighbors, or others. (Tr. 274).

5

On July 26, 2011, Plaintiff completed an "Activities of Daily Living" form. (Tr. 287). Plaintiff noted she was able to do the dishes, vacuum, and clean "once in a while." (Tr. 287). Twice a month, she would grocery shop and attend church, and needed assistance to grocery shop because she "tend[ed] to overspend or [buy] the wrong stuff" and became "overwhelmed quickly." (Tr. 287-288). She did not cook, but was able to take care of her personal needs without assistance. (Tr. 288). She watched television and listened to the radio. (Tr. 288). She used to enjoy reading, but no longer engaged in this activity as of the date of the form. (Tr. 288).

At her oral hearing[7] on March 4, 2013, Plaintiff testified that she was able to walk about a block before needing to stop and rest due to leg and lower back pain and shortness of breath for fifteen (15) to twenty (20) minutes. (Tr. 104). She was unsure as to the weight she was able to lift or carry. (Tr. 104). She was able to stand in one spot for about ten (10) to twenty (20) minutes before her legs would begin to hurt causing her to have to sit down for about ten (10) minutes to relieve the pain. (Tr. 104). She was only able to sit for about thirty (30) minutes before she experienced back pain and hip pressure. (Tr. 105). She testified that she had

_____

7. There is evidence in the transcript from this hearing that this was Plaintiff's second oral hearing; however, Defendant has failed to provide this Court with the transcript from the first oral hearing. (Tr. 90).

difficulty sleeping, and averaged about three (3) to four (4) hours of sleep a night. (Tr. 105). She felt tired all day as a result, and usually took at least a one (1) hour nap every day at varying times. (Tr. 105-106). Since 2011, she left her house about once a week to go to therapy, and otherwise only left her house for other appointments, because she didn't like to be around people, stating, "I always have a lot of thoughts in my head, like they're talking about me, or thinking about me, or they're looking at me, and I don't like that. It just makes me feel uncomfortable and it puts a lot of anxiety on me." (Tr. 106-107). She always attended her appointments with either her husband or her caseworker. (Tr. 107).

Kathleen Warman, Plaintiff's mental health case manager, also testified at this hearing. (Tr. 109). She stated that she had been Plaintiff's mental health case manager for four (4) years, and that she had seen Plaintiff weekly for the first three (3) years and monthly for the last year. (Tr. 109, 114). She accompanied Plaintiff to all of her mental health appointments in order to ensure continuity of care with Plaintiff's providers and to help Plaintiff "express what was going on at the time with medications or with symptoms she was having." (Tr. 110). When asked by the ALJ what Plaintiff's "biggest thing [the mental health case manager saw] as a problem for [Plaintiff]" in terms of functioning on a daily basis, Ms. Warman responded that Plaintiff's depression was very debilitating at times to the point

7

where she was unable to complete activities of daily living, including showering, basic needs, cooking, taking care of her family, an inability to leave the house even for appointments due to social phobias, and being fearful of going out in public due to large crowds. (Tr. 112-113). She testified that in terms of Plaintiff's appointments, "[a] lot of times [Plaintiff] wouldn't go to the appointments unless somebody accompanied her because of her social phobias." (Tr. 113). She also noted that she would visit Plaintiff weekly "to monitor her in the household to make sure she was staying safe, she wasn't having harmful thoughts to hurt herself or others, which is the basis of my involvement with [Plaintiff]." (Tr. 113). Ms. Warman further stated that Plaintiff and her doctor "struggled getting her on a level of medication that has been beneficial to her." (Tr. 116).

## MEDICAL RECORDS

### 1.   Physical Impairment Record

On July 28, 2009, Plaintiff underwent an ultrasound of her pelvis. (Tr. 372). The results were unremarkable. (Tr. 372).

On August 31, 2009, Plaintiff had an appointment with Michael Bosak, M.D. of Associated Cardiologists, P.C. (Tr. 345). It was noted that despite her history of morbid obesity, asthma, and gastroesophageal reflux, she felt well. (Tr. 345). Plaintiff told Dr. Bosak that if she took her Advair, she did not have

8

shortness of breath, and that her chest discomfort completely resolved since starting Prevacid. (Tr. 345). Her blood pressure was also listed as "ok." (Tr. 346). Plaintiff denied experiencing shortness of breath, syncope or near syncope, lightheadedness, dizziness, or palpitations. (Tr. 345). Her diagnoses included morbid obesity, cardiomyopathy, shortness of breath, and an abnormal exercise nuclear study. (Tr. 345). Her medications included Bentyl, Citracal, Prevacid, Tylenol, Reglad, Promethazine, Celexa, Topamax, Ibuprofen, Advair, Albuterol, Mirapex, Simvastatin, Fish Oil, Vistaril, Lamotrigine, Mobic, Seroquel, and Maxalt. (Tr. 345). She was scheduled for a follow-up for nine (9) months later. (Tr. 346).

On September 3, 2009, Plaintiff had an appointment with Stephen Ross, M.D. for evaluation of her RLS, sleep disturbances, and migraines. (Tr. 619). Regarding her migraines, she had been waking up with them almost daily, they were usually left-sided and sharp in characteristic, and were accompanied by photophobia, phonophobia, osmophobia, and allodynia. (Tr. 619). Maxalt no longer controlled the migraines, and Imitrex provided only moderate efficacy. (Tr. 619). She was also on Topamax prophylactically to prevent migraines. (Tr. 619). A sleep study was performed because it was thought that Plaintiff's sleep deprivation was causing the migraines, and this study found that Plaintiff did not

enter REM sleep. (Tr. 619). On examination, Plaintiff was oriented in three (3)

spheres, had clear and fluent speech, demonstrated excellent recall of recent and

remote events, and had appropriate attention span and concentration. (Tr. 620).

Plaintiff had a normal neurological exam, but did exhibit abnormal reflexes and

ataxia with tandem walking. (Tr. 620-621). A brain MRI was ordered, Plaintiff

was instructed to take ReQuip for her RLS, and she was scheduled for a follow-up

in four (4) weeks. (Tr. 621).

On October 12, 2009, Plaintiff had an appointment with Ravikumar

Singareddy, M.D. for sleep problems. (Tr. 614). She reported that she had

difficulty both initiating and maintaining sleep. (Tr. 614). As a result of not

sleeping well at night, she took one (1) hour naps about three (3) days a week, but

that these naps were non-restorative and not refreshing. (Tr. 614). She was

diagnosed with insomnia possibly secondary to her "mood and anxiety

disturbances." (Tr. 615).

On November 6, 2009, Plaintiff had an appointment with Scott Goldstein,

D.O. for headaches. (Tr. 603). She was diagnosed with migraines, received

Toradol, and was instructed to follow-up with a neurologist. (Tr. 604).

On February 24, 2010, Plaintiff had an appointment with Andrea Rigby,

Psy.D. for a psychological assessment for a surgical weight loss procedure. (Tr.

10

572). Plaintiff reported that her problems with weight began at age ten (10), that she did not engage in binge eating, that she walked as a form of exercise, that she was attempting to quit smoking, and that she abused alcohol in her twenties and methamphetamines from 2000 through 2001. (Tr. 572-573). Plaintiff discussed that she had a fifteen (15) year old son and a six (6) year old daughter, and that she had been raped on multiple occasions. (Tr. 573). Her work history included working as a secretary, waitress, bartender, customer service representative, and a cashier. (Tr. 573). Her mental status exam revealed that she was oriented in three (3) spheres, had a dysthymic mood, was defensive, was unwilling to disclose the facts of her mental health history, denied psychotic thought and suicidal and homicidal ideations, had organized and logical thoughts, and had poor judgment and insight. (Tr. 574). Two (2) psychological tests were administered, including the Beck Depression Inventory-II and the Weight and Lifestyle Inventory ("WALI"). (Tr. 574). Her responses to the Beck test indicated that she was currently experiencing a minimal range of depressive symptoms. (Tr. 574). Her responses to the WALI indicated that she had the cognitive abilities to complete accurate records of her eating activity. (Tr. 574). Her Axis I diagnoses included: Eating Disoder, not otherwise specified; Bipolar I Disorder, most recent episode mixed, moderate; Generalized Anxiety Disorder; Opioid Abuse, sustained full

remission; Alcohol Abuse, sustained full remission, Sexual Abuse as a Child; and

Physical Abuse as a Child. (Tr. 575). Her Axis III diagnoses included: obesity;

Gastroparesis; arthritis; IBS; GERD; RLS; asthma; hyperlipidemia; and sleep

apnea. (Tr. 575). Her Global Assessment of Functioning ("GAF")[8] was a fifty-

---

8. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. American Psychiatric Association (2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.). Washington, DC: Author. A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. Id. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. Id. Recently, the American Psychiatric Association no longer uses the GAF score for assessment of mental disorders due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed. Solock v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014) (citing Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16, 2014)); See Am.

five (55).  (Tr. 575).

On March 10, 2010, Plaintiff had an appointment with Gaganvir Singh,

M.D. for complaints of continued sleep problems.  (Tr. 601).  It was noted that a

prior sleep study conducted on May 9, 2009 showed no significant sleep apnea.

(Tr. 601).  Plaintiff was prescribed and was regularly taking Ambien since her last

visit with minimal benefits as she continued to have difficulty with initiating and

maintaining sleep causing excessive daytime sleepiness and a tired feeling.  (Tr.

601).  She stated that her RLS was well-managed with her current medications.

(Tr. 601).  Plaintiff was switched from Ambien to Lunesta, and was scheduled for

a follow-up in two (2) months.  (Tr. 602).

On May 5, 2010, Plaintiff had an appointment with Ravikumar Singareddy,

M.D. for a follow-up of her insomnia.  (Tr. 594).  The notes from this visit state

that Plaintiff was switched from Lunesta to Sonata, which Plaintiff was taking on a

regular basis, but that was not helping in terms of either falling or staying asleep.

(Tr. 594).  She continued to have problems both initiating and maintaining sleep.

---

Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 5d, 16
(2013).  As a result, the SSA permits ALJs to use the GAF score as opinion
evidence when analyzing disability claims involving mental disorders; however, a
"GAF score is never dispositive of impairment severity," and the ALJ, therefore,
should not "give controlling weight to a GAF from a treating source unless it is
well[-]supported and not inconsistent with other evidence."  SSA AM-13066 at 5
(July 13, 2013).

(Tr. 594). It was also noted that her RLS was under control with ReQuip. (Tr. 594). Her mental status examination revealed that she was appropriately dressed, had spontaneous, coherent, and relevant speech, was cooperative and pleasant, had a euthymic mood and affect, and had normal perception and thought content and process. (Tr. 594). Plaintiff was switched back to Lunesta, and was scheduled for a follow-up in four (4) weeks. (Tr. 595).

On July 19, 2010, Plaintiff had a follow-up visit with Hershey Medical Center for her on-going insomnia. (Tr. 565). Plaintiff reported that despite trials of Ambien, Trazodone, Sonata, and Restoril, she did not see any significant improvement in her nocturnal sleep disturbances, and she continued to endorse substantial difficulty falling and staying asleep. (Tr. 565). It was noted that she should start Lunesta at bedtime for insomnia, and that she should continue on Mirapex at bedtime because it continued to control her RLS. (Tr. 565).

On January 25, 2011, Plaintiff underwent a sleep study at Hershey Medical Center. (Tr. 551). As a result of the study, Plaintiff was diagnosed with Moderate Obstructive Sleep Apnea Syndrome and Periodic Limb Movement. (Tr. 553).

On March 31, 2011, Plaintiff had an appointment with Lisa Brenize, PAC for her symptoms related to GERD, gastroparesis, and IBS. (Tr. 494). Plaintiff reported a flare of her gastroparesis, vomiting, and abdominal pain. (Tr. 494).

14

Her diagnoses were noted as gastroparesis, GERD, IBS, asthma, unspecified disorder of lipoid metabolism, RLS, unspecified secondary cardiomyopathy, Bipolar Disorder, and migraine without aura. (Tr. 495).

From November 17, 2011 through November 21, 2011, Plaintiff was hospitalized at Milton S. Hershey Medical Center for acute renal failure and lithium toxicity, despite taking her medication as prescribed, and she was placed on dialysis. (Tr. 530, 538).

On March 17, 2012, Plaintiff was seen at Milton S. Hershey Medical Center following a fall. (Tr. 801). It was noted that she slipped on the stairs, and complained of left hip and back pain. (Tr. 801). She underwent an x-ray of the pelvis, which showed osteoarthritic change involving the right hip. (Tr. 805). The doctor diagnosed contusion of the hip. (Tr. 805).

On May 28, 2012, Plaintiff presented to the emergency room at Pinnacle Health in Harrisburg due to complaints of coughing and wheezing. (Tr. 786). She was discharged the same day with a final diagnosis of asthma exacerbation. (Tr. 789). She was prescribed Prednisone, and told to follow-up with her primary care physician. (Tr. 789).

On August 7, 2012, Plaintiff underwent an x-ray of her lumbar spine, which showed moderate intervertebral disc degeneration at the L5-S1 level, with mild

end-plate degenerative changes throughout the remainder of the lumbar spine. (Tr.

793).

On August 21, 2012, Plaintiff reported for a colonoscopy with a

preoperative diagnosis of "Diarrhea to rectal bleeding." (Tr. 810). The

colonoscopy had to be aborted due to poor bowel preparation. (Tr. 806).

On September 9, 2012, Plaintiff underwent a second colonoscopy. (Tr.

827). The impression was that there were findings consistent with fatty infiltration

of the liver. (Tr. 828).

On October 31, 2012, Plaintiff had an appointment at Harrisburg

Gastroenterology due to complaints of chronic constipation. (Tr. 846). Her

diagnoses include gastroparesis, IBS, GERD/reflux, migraines, RLS, asthma,

bipolar disorder and unspecified disorder of lipoid metabolism. (Tr. 846-847).

On November 16, 2012, Plaintiff presented to the emergency room at

Pinnacle Health with complaints of increased epigastric pain with vomiting. (Tr.

867). Plaintiff was diagnosed with an acute exacerbation of gastroparesis. (Tr.

871).

On January 2, 2013, Plaintiff had an appointment with Cynthia Rizk, M.D.

(Tr. 877). The following was noted: (1) Plaintiff stated she was not having any

"psych" symptoms and was doing well on Latuda; (2) Plaintiff was having

difficulty with her diet, gastroparesis, IBS, and diabetes; and (3) Plaintiff

complained of arthritis in her back, for which she was on a wait list to see a

rheumatologist. (Tr. 874). Dr. Rizk diagnosed Plaintiff with diabetes,

questionable COPD versus asthma, obesity, obstructive sleep apnea, hypertension,

arthritis, migraines, and carpal tunnel syndrome. (Tr. 876).

### 2. **Mental Health Records**

On June 15, 2009, Plaintiff presented to Samuel Garloff, D.O. at T.W.

Ponessa & Associates Counseling Services, Inc. for a psychiatric evaluation,

diagnostic interpretation, and medication management. (Tr. 461). Her psychiatric

history included a first psychiatric admission at age eleven (11) for homicidal

ideations, and then again at age fifteen (15) when she received a diagnosis of

Bipolar Disorder. (Tr. 461). She was also hospitalized at age eighteen (18) for

Postpartum Depression. (Tr. 461). Her last admission for psychiatric reasons had

been in 2002. (Tr. 461). Her mental status exam revealed an anxious mood,

appropriate affect, spontaneous and relevant speech, and good psychomotor

activity. (Tr. 462). Plaintiff denied suicidal and homicidal thoughts and

hallucinations, but her thought content revealed vivid dreaming. (Tr. 462). Her

Axis I diagnosis was Bipolar Disorder, her Axis III diagnoses included obesity,

migraines, gastroparesis, arthritis, IBS, and GERD, and her GAF was a forty-five

(45). (Tr. 462). Plaintiff's Lamictal and Seroquel were increased, her Celexa was decreased, and Vistaril was added. (Tr. 462). She was scheduled for a follow-up visit in six (6) weeks. (Tr. 462).

On September 12, 2009, December 11, 2009, March 11, 2010, June 10, 2010, and September 16, 2010, Plaintiff attended individual and family counseling at Youth Advocate Program Family Clinic for her symptoms of anxiety, depression, and bipolar disorder. (Tr. 463-483, 830-837). At these appointments, it was noted that her symptoms of mania and depression continued to be under control due to medication management and because Plaintiff was learning coping skills to handle depressive and manic symptoms. (Tr. 480). It was noted that she had good insight and was motivated to improve her life and care for her children. (Tr. 480).

On August 11, 2009, Plaintiff had a follow-up appointment with Dr. Garloff. (Tr. 459). Plaintiff reported she was still having racing thoughts. (Tr. 459). Her mental status exam revealed she was morbidly obese, well-developed, nourished, hydrated, and oriented. (Tr. 459). It also revealed she had a euthymic mood, a level affect, spontaneous speech, racing thoughts, and intact insight and judgment. (Tr. 459). She denied having suicidal or homicidal thoughts or ideations, and denied having hallucinations or delusions. (Tr. 459). Plaintiff's

Seroquel and Vistaril were increased, and her other medications remained the same. (Tr. 459-460). She was scheduled for a follow-up in six (6) weeks. (Tr. 459).

On September 10, 2009, Plaintiff had a follow-up appointment with Dr. Garloff. (Tr. 457). Plaintiff had been experiencing increasing anxiety. (Tr. 457). Her mental status exam revealed she was oriented, obese, nourished, and well-developed, and had an anxious mood and affect, spontaneous and relevant speech, and intact insight and judgment. (Tr. 457). Her Axis I diagnosis was Bipolar Disorder, her Axis III diagnoses included obesity, migraines, gastroparesis, arthritis, IBS, GERD, and RLS, and her GAF was a forty-five (45) to fifty (50). (Tr. 457). Plaintiff was prescribed Trazodone in addition to her other medications. (Tr. 457).

On October 2, 2009, Plaintiff had a follow-up appointment with Dr. Garloff. (Tr. 455). She stated she was doing better. (Tr. 455). Her mental status exam revealed a "morbidly obese, well-developed, nourished, and hydrated female with good hygiene, appearing her stated age." (Tr. 455). Plaintiff was noted as having a euthymic mood, an appropriate affect, spontaneous speech, good psychomotor activity, no suicidal or homicidal thoughts or ideations, a calm and composed thought content, and intact insight and judgment. (Tr. 455). Her Axis I diagnosis

19

was Bipolar Disorder with psychotic features, her Axis III diagnoses included obesity, migraines, gastroparesis, arthritis, IBS, GERD, and RLS, and her GAF was a fifty (50). (Tr. 455). She was scheduled for a follow-up in three (3) months, and was told to continue her current medications, which included Lamictal, Seroquel, Vistaril, Celexa, and Trazodone. (Tr. 456).

On December 2, 2009, Plaintiff had an appointment with Dr. Yaroslavsky for medication management and complaints of experiencing depression for about a month. (Tr. 452). She reported her medication was not working, and her anxiety was higher than usual. (Tr. 452). Her exam revealed that she was alert and oriented in all three (3) spheres, was not overtly psychotic, was pleasant and cooperative, had a depressed affect, denied suicidal and homicidal ideations, had a stable weight, and had normal triglycerides and cholesterol. (Tr. 452). She was prescribed Wellbutrin, and had a follow-up scheduled for three (3) weeks later. (Tr. 453).

On December 22, 2009, Plaintiff had an appointment with Dr. Yaroslavsky for medication management. (Tr. 450). She noted a significant improvement since she started taking Wellbutrin. (Tr. 450). She noted that her mood was almost normal, denied insomnia, suicidal, homicidal, and psychotic ideations, denied experiencing medication side-effects, did not experience an increase in

20

anxiety, and denied being hypomanic or manic. (Tr. 450). Plaintiff's exam noted she was pleasant and cooperative, had no thought disorder, had no suicidal or homicidal ideations, had no psychotic symptoms, had fair insight and judgment, and was oriented in all three (3) spheres. (Tr. 450). Plaintiff was scheduled for a follow-up in four (4) weeks. (Tr. 451).

On January 26, 2010 and March 30, 2010, Plaintiff had an appointment with Dr. Yaroslavsky for medication management. (Tr. 447, 449). Plaintiff stated she had been stable until the last week when she "got more problems with her children." (Tr. 447). Plaintiff's exam noted she was pleasant and cooperative, had no thought disorder, had a euthymic mood and affect, denied suicidal or homicidal ideations, had no psychotic symptoms, had good insight and judgment, and had no psychomotor abnormalities or involuntary movements. (Tr. 447, 449). Plaintiff was scheduled for a follow-up in two (2) to three (3) weeks. (Tr. 448).

On April 30, 2010, Plaintiff had an appointment with Dr. Yaroslavsky for medication management. (Tr. 443). Plaintiff complained of nightmares about past abuse. (Tr. 443). Plaintiff's exam noted she was well-groomed, anxious, slightly depressed, was preoccupied with somatic symptoms, denied suicidal or homicidal ideations, had no psychotic symptoms, had fair insight and judgment, and was oriented in all three (3) spheres. (Tr. 443). Dr. Yaroslavky added an Axis I

21

diagnosis of PTSD. (Tr. 443). Plaintiff was scheduled for a follow-up in four (4) weeks. (Tr. 444).

On June 4, 2010, Plaintiff had an appointment with Dr. Yaroslavsky. (Tr. 441). Plaintiff noted she had been experiencing racing thoughts, mood swings, and irritability. (Tr. 441). Dr. Yaroslavsky observed that Plaintiff was well-groomed, pleasant, not in acute distress, had a dysphoric mood and affect, had no psychotic symptoms, had no suicidal or homicidal ideations, had fair insight and judgment, and was oriented in all three (3) spheres. (Tr. 441). Plaintiff was scheduled for a follow-up in four (4) weeks.

On June 4, 2010, Plaintiff underwent a right knee comparison procedure. (Tr. 352). The procedure noted there was moderate right joint effusion, but the rest of the examination was otherwise negative. (Tr. 352).

On July 1, 2010, Plaintiff presented to the emergency room at Hershey Medical Center due to suicidal ideations with depression and anxiety. (Tr. 567). She had been thinking about cutting herself, and family problems were exacerbating her mental health issues. (Tr. 567). She signed a "201" and was transferred to a psychiatric facility. (Tr. 570).

On July 8, 2010, Plaintiff was examined by Sasha Pajerla, M.D. at the Pennsylvania Psychiatric Institute due to depression with suicidal ideations of

cutting herself and a subsequent trip the emergency room at Hershey Medical Center. (Tr. 374, 382). Plaintiff noted that she had become increasingly depressed over the prior few weeks, had difficulty getting out of bed, had significant anxiety attacks, had racing thoughts, and had been dealing with multiple stressors. (Tr. 374). Plaintiff had a history of Bipolar Disease, Type 2, Panic Disorder with agoraphobia, GERD, and RLS, and had a GAF of forty-five (45). (Tr. 374). On admission, she was noted as having a significantly depressed mood, difficulty getting out of bed, significant anhedonia, fatigue, irritability, increased anxiety, difficulty sleeping, and insomnia. (Tr. 374). Plaintiff was discontinued from all medications for a "washout of her medications over the weekend." (Tr. 374). Plaintiff was then placed on Seroquel and Lithium, and was able to sleep at night and participate in treatment and therapy. (Tr. 374). Upon discharge, Plaintiff reported being happy, appropriate, casually groomed, and not feeling depressed anymore. (Tr. 375). Her affect was full, her speech was fluent, her thought process was goal-directed, her insight was poor, and her judgment was fair. (Tr. 375). She denied suicidal or homicidal ideations, paranoia, urges to cut, and delusions. (Tr. 375). She was listed as stable upon discharge with a guarded prognosis, and was discharged to Edgewater's partial therapy program. (Tr. 375).

On July 16, 2010 and August 13, 2010, Plaintiff had appointments with Dr.

23

Yaroslavsky, M.D. at T.W. Ponessa & Associates Counseling Services for medication management. (Tr. 437, 439). Her exams noted she was pleasant, cooperative, not in acute distress, had a euthymic mood and affect, had fair insight and judgment, and was oriented in three (3) spheres. (Tr. 437, 439). Plaintiff complained of insomnia. (Tr. 437, 439). Plaintiff's Axis I diagnoses included Bipolar Disorder with psychotic features and PTSD, her Axis III diagnoses included obesity, migraines, gastroparesis, arthritis, IBS, GERD, and RLS, and her GAF was fifty (50). (Tr. 437, 439). She was scheduled for a follow-up in eight (8) weeks. (Tr. 438, 440).

On October 20, 2010, Plaintiff had an appointment with Dr. Yaroslavsky for medication management. (Tr. 659). She described herself as doing well, and that she had seen a sleep specialist who advised her to alternate between Elavil and Lunesta for her sleep problems, which seemed to be satisfactory. (Tr. 659). Her exam revealed she was not in acute distress, had a euthymic mood and affect, was not overtly psychotic, denied having suicidal or homicidal ideations, had fair insight and judgment, and was oriented in three (3) spheres. (Tr. 659). Plaintiff was instructed to continue with her medications and therapy, and to return in two (2) months. (Tr. 660).

On December 15, 2010, Plaintiff had an appointment with Dr. Yaroslavsky

24

for medication management, and described herself as becoming progressively more and more depressed. (Tr. 657). She stated she felt unmotivated, spent most of the day in bed, and missed appointments. (Tr. 657). Her exam revealed she was not in acute distress, had a moderately depressed mood and affect, was not overtly psychotic, denied suicidal or homicidal ideations, had fair insight and judgment, was oriented in three (3) spheres, and did not show any pressured speech or thought disorder. (Tr. 657). Plaintiff was prescribed Cymbalta, and was to be seen for a follow-up in six (6) weeks. (Tr. 658).

On March 20, 2011, Plaintiff had an appointment with Dr. Yaroslavsky for medication management. (Tr. 655). Plaintiff stated she was doing "much better with Cymbalta." (Tr. 655). Her examination revealed she was pleasant, cooperative and overweight, had a euthymic mood and affect, showed no abnormal or involuntary movements or psychomotor abnormalities, denied being suicidal or homicidal, had fair insight and judgment, and was oriented in three (3) spheres. (Tr. 655). She was scheduled for a follow-up in two (2) months. (Tr. 656).

On May 5, 2011, Plaintiff had an appointment with Dr. Yaroslavsky for medication management, and she noted she had been doing well with a stable mood and good energy. (Tr. 653). Her exam revealed she was pleasant,

cooperative, and oriented, and had a euthymice mood and affect and fair insight and judgment. (Tr. 653).  She was instructed to continue her current medications and return for a follow-up in two (2) months. (Tr. 654).

On May 18, 2011, Plaintiff underwent a mental health examination performed by consultative examiner Louis Laguna, Ph.D. (Tr. 504-508).  Initially, Dr. Laguna observed that Plaintiff's mannerisms were noteworthy in that she looked straight ahead during the interview without making eye contact with Dr. Laguna even once. (Tr. 505).  She appeared "almost zombie-like," spoke "in a robotic way," and "was quite absent of any emotional variability." (Tr. 505). However, Plaintiff understood his questions and had good hygiene. (Tr. 505). Plaintiff stated that it was hard for her to get out of bed due to her mental state, that she had bad social phobia, and that she had been experiencing manic symptoms, including racing thoughts and hearing voices. (Tr. 505).  She discussed her psychiatric history with Dr. Laguna, and her current medications, which included Lithium, Geodon, Elavil, and Cymbalta, which seemed to work, but caused her to feel zoned out. (Tr. 505).  Her history included several episodes of molestation while growing up. (Tr. 506).  She denied ever being arrested and denied drug and alcohol problems. (Tr. 506).  The notes from her mental status exam state that Plaintiff had low self-esteem, was cooperative, had pressured and

robotic speech, answered questions clearly, had intact thought processes, could think abstractly, had intact recent and remote memory, had no impulse control problems, had fair judgment, and had good insight. (Tr. 506-507). Dr. Laguna's Axis I diagnosis for Plaintiff was Bipolar I Disorder, the Axis III diagnosis included asthmas, diabetes, IBS, and GERD, and her GAF was a forty-eight (48). (Tr. 507). Dr. Laguna then filled out a Medical Source Statement, opining the following: (1) Plaintiff's ability to understand, remember, and carry out instructions was not affected by her impairment; (2) Plaintiff had a slight impairment in interacting appropriately with the public, supervisors, and co-workers, and a moderate impairment in responding appropriately to work pressures in a usual work setting and to changes in a routine work setting; and (3) Plaintiff could manage benefits in her own best interest. (Tr. 509-510).

On May 25, 2011, Plaintiff underwent a Mental Residual Functional Capacity Assessment completed by Roger Fretz, Ph.D. (Tr. 514). Dr. Fretz opined that Plaintiff: (1) was not significantly limited in her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to carry out detailed instructions, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to work in coordination with or proximity to others without

being distracted by them, to make simple work-related decisions, to complete a

normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number

and length of rest, to ask simple questions or request assistance, to accept

instructions and respond appropriately to criticism from supervisors, to maintain

socially appropriate behavior and to adhere to basic standards of neatness and

cleanliness, to respond appropriately to changes in the work setting, to be aware of

normal hazards and take appropriate precautions, to travel in unfamiliar places or

use public transportation, and to set realistic goals or make plans independently of

others; and (2) was moderately limited in her ability to understand and remember

detailed instructions, to maintain attention and concentration for extended periods,

to interact appropriately with the public, and to get along with coworkers or peers

without distracting them or exhibiting behavioral extremes. (Tr. 512-513).

A Psychiatric Review Technique was also completed on May 25, 2011, by

Dr. Fretz. (Tr. 526). He concluded that Plaintiff had Bipolar Disorder, but that it

did not satisfy the requirements of Impairment Listing 12.04, Affective Disorders.

(Tr. 519). Dr. Fretz opined that Plaintiff had mild restrictions in activities of daily

living, moderate difficulties in maintaining social functioning and maintaining

concentration, persistence, or pace, and one (1) or two (2) episodes of

decompensation, each of extended duration. (Tr. 526).

On August 10, 2011, Plaintiff had an appointment with Dr. Yaroslavsky for medication management, at which she complained about hearing voices and experiencing crying spells. (Tr. 651). She also noted that she felt more on the depressed side, but denied being suicidal. (Tr. 651). Her exam revealed she was pleasant, cooperative, and overweight, had a moderately dysphoric mood and affect, was anxious, denied being suicidal or homicidal, had an overall linear thought process, was not in acute distress, had limited insight and judgment, and was oriented in three (3) spheres. (Tr. 651). Her Lithium, Geodon, and Elavil doses were increased, and she was to be seen again in two (2) weeks. (Tr. 652).

On August 24, 2011, Plaintiff presented to Dr. Yaroslavsky for an emergency appointment due to feeling shaky and rigid and having difficulty with memory and concentration after her Lithium, Geodon, and Elavil levels were increased two (2) weeks prior. (Tr. 649). Upon examination, Plaintiff was coherent, had unstable gait, was able to ambulate, had some tremors in her arm and some mild rigidity, was not overtly psychotic, denied being suicidal or homicidal, described her overall mood as good, had an anxious affect, and had fair insight and judgment. (Tr. 649). A three (3) day washout of all her psychiatric medications was recommended, and she was scheduled for a follow-up for a week

29

later. (Tr. 650).

On August 31, 2011, Plaintiff had an appointment with Dr. Yaroslavsky for medication management, at which it was noted that she recovered from the symptoms of Lithium toxicity quickly after her medications were discontinued. (Tr. 647). Because she started feeling well, she restarted her medications slowly and felt "quite stable." (Tr. 647). Her exam revealed she was pleasant and cooperative, she was oriented, she did not seem confused, she had a linear thought process, she did not present with evidence of psychosis, her mood and affect were mildly anxious, her insight and judgment were fair, and she denied being suicidal or homicidal. (Tr. 647). Plaintiff was instructed to have blood work done to monitor her Lithium levels, to continue with individual psychotherapy, and to come in for a follow-up in four (4) weeks. (Tr. 648).

On September 28, 2011, Plaintiff had an appointment with Dr. Yaroslavsky for medication management. (Tr. 645). Plaintiff described herself as doing well, but still experiencing insomnia. (Tr. 645). Plaintiff was pleasant and cooperative, had good eye contact, had a linear thought process, had fluent and coherent speech, had no delusions or hallucinations, denied being suicidal or homicidal, and showed no abnormal or involuntary movements. (Tr. 645). Plaintiff was prescribed Ambien, and was to schedule a follow-up for six (6) to eight (8) weeks

later. (Tr. 646).

On December 11, 2011, Plaintiff had an appointment with Dr. Yaroslavsky for medication management, and described herself as doing "quite well." (Tr. 773). Plaintiff denied having any depressive symptoms and felt stable. (Tr. 773). Her medications at this time included Geodon, Elavil, Ambien, and Cymbalta. (Tr. 773). Her exam revealed she was pleasant and cooperative, she was not in acute distress, she was well-kept, her thought process was linear, her mood was good, she denied delusions, hallucinations, and suicidal and homicidal ideations, her insight and judgment were fair, and she was oriented in three (3) spheres. (Tr. 773). She was instructed to continue her medications, and was scheduled for a follow-up in four (4) to six (6) weeks. (Tr. 774).

On February 9, 2012, Plaintiff had an appointment with Dr. Yaroslavsky for medication management, and described herself as being stable. (Tr. 823). It was noted that she denied any symptoms of mania or hypomania and that her depression was relatively well-controlled, but she was experiencing "around-the-clock" anxiety mostly related to taking care of her children. (Tr. 823). Plaintiff was prescribed Clonazepam for anxiety, was to attend psychotherapy, and was to follow-up in three (3) to four (4) weeks. (Tr. 824).

On March 8, 2012, Plaintiff had an appointment with Dr. Yaroslavsky for

medication management, and described her anxiety as better-controlled with Clonazepam. (Tr. 821). Plaintiff was noted as appearing mildly anxious, but lacking in depressive symptoms. (Tr. 821). Her insight and judgment were fair, and she showed no abnormal movements. (Tr. 821).

On March 29, 2012, Plaintiff had an appointment with Dr. Yaroslavsky for medication management, and noted that she had been feeling more and more depressed. (Tr. 819). She also noted that she had started experiencing passive suicidal ideation, but denied being currently suicidal. (Tr. 819). Her exam revealed that she was pleasant, cooperative, well-kept, and was void of delusions and suicidal and homicidal ideations. (Tr. 819). Her mood and affect were depressed and her insight and judgment were fair. (Tr. 819). Plaintiff was scheduled for a follow-up in two (2) weeks. (Tr. 820).

On April 26, 2012, Plaintiff had an appointment with Dr. Yaroslavsky for medication management, and stated that she had been doing much better, that the Wellbutrin was working, and that she was seeing her therapist on a regular basis. (Tr. 817). Her exam revealed that she was pleasant, cooperative, well-kept, and in no acute distress. (Tr. 817). It also was noted that Plaintiff's mood and affect were euthymic, and her insight and judgment were fair. (Tr. 817).

On June 21, 2012, Plaintiff had an appointment with Dr. Yaroslavsky for

medication management, and described her mood as stable. (Tr. 815). She denied

any problems aside from insomnia. (Tr. 815). Her Elavil dose was increased, and

Plaintiff was scheduled for a follow-up in two (2) months. (Tr. 816).

On August 16, 2012, Plaintiff had an appointment with Dr. Yaroslavsky for

medication management. (Tr. 813). It was noted that she had gone to the

emergency room ten (10) days earlier for what she thought was Lithium toxicity

because she had blurry vision, was shaky, and was not stable when walking. (Tr.

813). Plaintiff was sent home from the emergency room with the instruction to

recheck interactions with her Geodon and Reglan. (Tr. 813). Her examination

revealed that she was cooperative and pleasant, was stable in terms of anxiety and

mood swings, denied being in acute distress or feeling suicidal or homicidal, and

had fair insight and judgment. (Tr. 813).

On October 31, 2012, Plaintiff had an appointment with Dr. Yaroslavsky for

medication management, and she reported that she had been feeling more anxious

lately. (Tr. 897). Her examination revealed that she was cooperative and pleasant,

denied being in acute distress or feeling suicidal or homicidal, had an anxious

mood and affect, and had fair insight and judgment. (Tr. 897). Plaintiff's

Clonezepam dosage was increased. (Tr. 898).

On December 19, 2012, Plaintiff had an appointment with Dr. Yaroslavsky

for medication management. (Tr. 895). She complained of intermittent manic symptoms generally lasting from three (3) to five (5) days, causing an inability to fall asleep, irritability, and anxiety. (Tr. 895). Her exam revealed that she was pleasant, cooperative, and not in acute distress, appeared euthymic and not sedated, was not overtly psychotic, had fair insight and judgment, and was oriented in three (3) spheres. (Tr. 895). Plaintiff was switched from Geodon to Latuda, and was scheduled for a follow-up in four (4) weeks. (Tr. 896).

On January 24, 2013, Plaintiff had an appointment with Dr. Yaroslavsky for medication management, and described herself as doing better on Latuda than Geodon, with some hypomanic symptoms lasting generally up to one (1) days. (Tr. 893). Her exam revealed a euthymic mood and fair insight and judgment. (Tr. 893). Plaintiff was cooperative and pleasant, was not overtly psychotic or in acute distress, and denied being suicidal or homicidal. (Tr. 893).

**STANDARD OF REVIEW**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of March 31,

2011. (Tr. 78). At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of June 15, 2009.

(Tr. 78).

At step two, the ALJ determined that Plaintiff suffered from the severe[9]

combination of impairments of the following: "morbid obesity, asthma, bipolar

disorder, borderline personality disorder, generalized anxiety disorder,

osteoarthritis of the right hip and degenerative disc disease of the lumbar and

cervical spine (20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. 78).

At step three of the sequential evaluation process, the ALJ found that

---

9. An impairment is "severe" if it significantly limits an individual's ability to
perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the
abilities and aptitudes necessary to do most jobs, such as walking, standing,
sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An
impairment or combination of impairments is "not severe" when medical and other
evidence establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an individual's
ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and
96-4p.

Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 79-81).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 81-85). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she requires alternating between sitting and standing. In addition, [Plaintiff] is limited to occasional work setting changes and decision making, occasional judgment, requires simple jobs of a GED of 1 or 2 in reasoning, math and language, and requires occasional interaction with supervisors and coworkers.

(Tr. 81).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 85-86).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between June 15, 2009, the alleged onset

date, and the date of the ALJ's decision.  (Tr. 86).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) substantial

evidence does not support the ALJ's finding at Step Two of the Sequential

Evaluation Process; (2) the ALJ erred at Step Three of the Sequential Evaluation

Process in determining that Plaintiff did not meet Listings 12.04 and 12.06; (3)

substantial evidence does not support the ALJ's Step Five evaluation; (4) the RFC

is not supported by substantial evidence; and (5) the ALJ erred in determining

Plaitniff's credibility.  (Doc. 12, pp. 1-2, 15-35) .  Defendant disputes these

contentions.  (Doc. 14, pp. ___).

### 1.  Opinion Evidence

Plaintiff argues that substantial evidence does not support the ALJ's RFC

determination because she did not take into account Plaintiff's limitations with

concentration, persistence, or pace. (Doc. 12, pp. 28-30).  In addressing this

claim, it is necessary to first examine the opinion evidence and the weight the ALJ

gave to each opinion.

The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g.,

Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true

41

when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Chandler v. Commissioner of Social Security, 667 F.3d 356, 361 (3d Cir. 2011)

("Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records . . . '[t]he law is clear . . . that the opinion of a treating physician does not bing the ALJ on the issue of functional capacity' . . . state agent opinions merit significant considerations as well.") (citing Brown v. Astrue, 649, F.3d 193, 197 n.2 (3d Cir. 2011)); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

In the case at hand, the ALJ gave partial weight to the opinion of Dr. Laguna, little weight to the four (4) GAF scores of fifty (50) assigned by Dr. Yaroslavsky, great weight to the four (4) GAF scores of fifty-five assigned by Dr. Yaroslavsky, and significant weight to the opinion of Dr. Fretz. (Tr. 84-85). Upon review of the entire record and the ALJ's RFC determination, it is determined that the ALJ improperly afforded significant weight to Dr. Fretz, the state agency physician, in reaching the RFC determination because the state agency examination record indicates that the whole medical record was not available for review by Dr. Fretz being that Plaintiff had at minimum fourteen (14)

appointments with Dr. Yaroslavsky, her treating psychiatrist, all of which took place after Dr. Fretz rendered his opinion. Therefore, Dr. Fretz's medical opinion did not involve a review of Plaintiff's entire mental health medical record, and thus was not well-supported. As discussed, in order for the ALJ to properly give any weight to a medical opinion, the medical record must have been available for and reviewed by the non-examining, non-treating physician. See Sassone, 165 F. App'x 954, 961 (3d Cir. 2006). However, as noted, the entire medical record was not available to the non-examining, non-treating physician, Dr. Fretz, whose opinion was afforded significant weight by the ALJ.

Therefore, because the opinion of the state agency physician was not well-supported by the entire record as it did not include a review of the at least fourteen (14) psychiatric appointments that took place after Dr. Fretz issued his medical opinion regarding Plaintiff's limitations resulting from her mental health impairments, substantial evidence does not support the ALJ's RFC determination. As such, remand on this basis is necessary, and this Court declines to address Plaintiff's remaining assertions.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence.

44

Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: April 26, 2016

/s/ William J. Nealon
**United States District Judge**